Thomas M. GAUBERT, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 90–434C.

United States Court of Federal Claims.

July 26, 1993.

Abbe David Lowell, Washington, DC, for plaintiff. David Earl Frulla, Brand & Lowell, of counsel.

George M. Beasley, III, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for defendant. Dina L. Biblin, Trial Litigation Section, F.D.I.C., of counsel.

## ORDER

NETTESHEIM, Judge.

The case is before the court after argument on defendant's motion to dismiss pursuant to RCFC 12(b)(1). Defendant argues that the court lacks jurisdiction over plaintiff's complaint pursuant to 28 U.S.C. § 1500 (1988), which precludes plaintiff from filing suit in the United States Court of Federal Claims once plaintiff files another action based on the same operative facts in another federal court.

## FACTS

The following facts derive from plaintiff's complaint or are otherwise undisputed. In January 1983 Thomas M. Gaubert ("plaintiff") purchased a controlling interest in the stock of a Texas state chartered savings and loan, which plaintiff renamed the Independent American Savings Association ("IASA"). Following IASA's purchase, plaintiff selected IASA's officers and directors and appointed himself chairman of the board of directors. Plaintiff remained the largest single shareholder in IASA until it entered receivership in 1987.

From 1983 to 1986, IASA turned profits and met all regulatory requirements. In December 1985 IASA estimated its net worth as approximately $74 million.[1]

In December 1983 plaintiff began discussing a merger between IASA and Investex Savings ("Investex") with the following thrift industry regulators: the Federal Home Loan Bank Board (the "FHLBB"), the Federal Home Loan Bank Board—Dallas (the "FHLB-D"), and the Federal Savings and Loan Insurance Corporation (the "FSLIC") (referred to herein as "the regulators," unless discussed in their individual capacities). Investex was in danger of financial collapse, and the regulators sought to prevent its bankruptcy by merging it with a healthy thrift.

In June 1984 IASA acquired 22 branches of the United Savings Association of Texas ("United") to qualify for the merger. In September 1984 IASA made its formal application to the regulators to purchase Investex and United.

During this same time period, the regulators separately investigated plaintiff's involvement in the business dealings of Capitol Savings and Loan ("Capitol"). Routine investigations of alleged wrongdoing within the thrift industry required plaintiff's

---

1. Plaintiff asserts that his equity in IASA had a market value of $75 million in 1984–85.

temporary removal from the thrift industry. This action threatened to undo the Investex merger, however.

In September 1984 the regulators offered plaintiff a temporary and voluntary quarantine from the thrift industry pending the outcome of the Capitol investigation. Plaintiff agreed and signed a contract created by Louis Roy of the FHLB–D. This contract, known as the "neutralization agreement," provided that plaintiff temporarily resign his posts and isolate himself from IASA's affairs, except as requested by the FHLB–D. In return for plaintiff's isolation, the regulators promised to expedite the Capitol investigation. The neutralization agreement was to terminate at the conclusion of the investigation. Plaintiff agreed to these terms. On December 28, 1984, plaintiff and the regulators executed the neutralization agreement.[2]

In a separate agreement, the regulators asked plaintiff to guarantee IASA's net worth during the neutralization period, pledging his personal assets as collateral.[3] Plaintiff agreed and transferred to IASA his personal interest in a tract of property called "Poole Lake/Cedar Lane" ("Cedar Lane"). At the time of the transfer, the Cedar Hill property was valued at approximately $40 million.

The Capitol investigation and the Investex merger proceeded on parallel tracks through the summer of 1985. At that time plaintiff became impatient with the pace of the investigation and complained to the regulators. After finding insufficient evidence of wrongdoing at Capitol, the regulators apparently expanded their investigation of plaintiff's banking and real estate businesses. Plaintiff became aware of this expansion when other thrift operators reported contact with regulators, who mentioned a possible criminal investigation of plaintiff. These contacts had a negative effect on IASA's business dealings.

In December 1985 plaintiff chose to sign an agreement which permanently removed him from further involvement in IASA and the thrift industry. At the request of the regulators, plaintiff met with the board and officers of IASA and informed them that the regulators would close and liquidate IASA's assets unless they resigned. The board and officers complied. In April 1986 the FHLB–D replaced them with a new set of officials. Thereafter, the regulators played an active role in managing IASA's operations.

In the summer of 1986, IASA's new management declared insolvency after writing off accounting goodwill from the Investex merger and United acquisitions, as well as devaluing some of IASA's real estate loans. The regulators estimated IASA's negative net worth at more than $300 million. On May 20, 1987, they placed IASA into federal receivership.

Several lawsuits resulted from IASA's insolvency. Three of these lawsuits are important to the court's jurisdiction, as they involved claims or counterclaims by plaintiff which were outstanding at the time the present suit was filed on May 21, 1990, in the former United States Claims Court, now the United States Court of Federal Claims.

In the first of these cases, *Federal Savings and Loan Insurance Corp. v. Crowe*, Civ.Act. No. CA3–86–3166–T (N.D.Tex., filed Dec. 29, 1986), the United States sued IASA's former directors, including plaintiff Gaubert, on behalf of IASA's Employee Stock Ownership Plan ("ESOP").[4] On March 14, 1989, Gaubert filed a $75 million counterclaim for the loss of his equity in IASA, alleging regulatory malfeasance. On June 16, 1989, the district court dismissed the counterclaim, opining that it did not arise out of the same transaction as the original ESOP claim. On July 3, 1989, Gaubert filed a compulsory counterclaim

---

**2.** Plaintiff asserts that this agreement was an exception to the regulators' common practice during such an investigation.

**3.** Plaintiff asserts that this promise was also a departure from common practice, although the regulators assured him that it was routine.

**4.** The case was originally filed under the caption *Independent American Savings Bank v. Crowe*. In 1988 the FSLIC substituted itself as plaintiff for IASA.

for recoupment, which remained pending when the instant action was filed.

The second case, *Gaubert v. United States,* Civ.Act. No. 3–87–2989–T (N.D.Tex., filed Dec. 17, 1987), was filed by Mr. Gaubert individually against the FSLIC, the FHLBB, and the FHLB–D pursuant to the Federal Tort Claims Act (the "FTCA"). Plaintiff sought $75 million in damages, measured as the value of his lost investment in IASA. On April 11, 1988, plaintiff amended his complaint to join a $25 million claim for the loss of the Cedar Lane property. On September 28, 1988, the court dismissed the suit, holding that plaintiff lacked standing to assert either claim under the "discretionary function" exception to the FTCA. Plaintiff appealed this dismissal, and on October 17, 1989, the United States Court of Appeals for the Fifth Circuit affirmed in part and reversed in part, ruling that plaintiff had standing only to assert the $25 million Cedar Lane claim. *Gaubert v. United States,* 885 F.2d 1284 (5th Cir.1989). On June 5, 1990, the United States Supreme Court granted the regulators' certiorari petition. *United States v. Gaubert,* 496 U.S. 935, 110 S.Ct. 3211, 110 L.Ed.2d 659 (1990). On March 26, 1991, the Court ruled that the disposition of the Cedar Lane property qualified as a discretionary act, which therefore fell within the Government's sovereign immunity, as well. *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). The case was remanded to the Fifth Circuit for dismissal. *Gaubert v. United States,* 932 F.2d 376 (5th Cir.1991).

Plaintiff filed *Gaubert v. Gray,* Civ.Act. No. 87–3500 (D.D.C., filed Dec. 24, 1987), seeking a *Bivens* recovery for damages against the individual regulatory officials involved in IASA's affairs.[5] Plaintiff sought $76 million in compensatory damages and $100 million in punitive damages, measured primarily as the value of his lost investment in IASA. On August 27, 1990, the court dismissed the case. *Gaubert v. Gray,* 747 F.Supp. 40 (D.D.C.1990). Plaintiff moved to amend or alter pursuant to

Fed.R.Civ.P. 59(e). On October 17, 1990, the court denied the motion. Plaintiff did not appeal.

On May 21, 1990, plaintiff filed the instant action. Plaintiff seeks $75 million in damages against the United States, alleging a taking and breach of contract. Plaintiff alleges that the regulators' malfeasance breached the neutralization agreement and deprived him of the value of his stock holdings. Plaintiff does not seek recovery of the $25 million Cedar Lane property. Defendant moved to dismiss for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1500, alleging that previously filed actions against the United States seeking monetary relief based on the same operative facts bar plaintiff's action. On May 25, 1992, the court stayed the decision pending the Supreme Court's resolution of this issue in *UNR Industries, Inc. v. United States,* 962 F.2d 1013 (Fed.Cir.1992), *aff'd sub nom. Keene Corp. v. United States,* —— U.S. ——, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993). The Supreme Court has now ruled, and the case moves forward on defendant's motion to dismiss.

## DISCUSSION

28 U.S.C. § 1500 divests the Court of Federal Claims of jurisdiction over any previously filed action if both suits are based on the same claims. As the Supreme Court recently has affirmed the holding in *UNR,* two lawsuits assert the "same claim" if they share a common core of operative facts. *Keene Corp.,* —— U.S. ——, 113 S.Ct. at 2041–44. "Sameness" is based therefore on the basic underlying events causing the litigation, rather than on the theories of recovery asserted, the identity of the defendants, or the portion of facts litigated. *Keene,* —— U.S. at ——, 113 S.Ct. at 2040–42; *Johns–Manville Corp. v. United States,* 855 F.2d 1556, 1557–58 (Fed.Cir.1988) (claims arising from common facts are the same, even if all legal theories cannot be asserted in one court); *see also*

---

**5.** Government agents may be sued in their individual capacity for unconstitutional acts irrespective of the bar of sovereign immunity. *Bi-* *vens v. Six Unknown Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

*British American Tobacco Co. v. United States,* 89 Ct.Cl. 438, 440, 1939 WL 4266 (1939), *cert. denied,* 310 U.S. 627, 60 S.Ct. 974, 84 L.Ed. 1398 (1940) (terminology of recovery theories does not obscure common identity of two claims).

To pursue a case against the United States in the Court of Federal Claims and another federal court is to pursue simultaneous, dual litigation of a single claim disallowed under section 1500 by *Keene,* —— U.S. at ——, 113 S.Ct. at 2038–40. Plaintiff argues that this is not what he sought to accomplish when he filed the instant case. He maintains that the three IASA-related actions currently or formerly pending against the United States differ substantially from the instant action and therefore do not trigger the section 1500 jurisdictional bar.

In *Gaubert v. United States,* plaintiff sought recovery against the Government under the auspices of the FTCA. Plaintiff claimed $75 million as the lost value of his equity in IASA and later added a claim for $25 million for the loss of the Cedar Lane property. At the time the instant case was filed, plaintiff's $25 million claim was still pending in the Fifth Circuit.[6]

Plaintiff argues that section 1500 does not bar jurisdiction in the Court of Federal Claims since at present he asserts only the $75 million claim. Plaintiff points out that this claim had been dismissed by the Fifth Circuit by the time he filed the instant case. Plaintiff further asserts that the two claims are based on separate transactions and different sets of facts. The court cannot agree with this characterization.

**6.** *Gaubert v. United States* remained pending during the filing of the case at bar due in part to defendant's protracted efforts to defeat jurisdiction. Plaintiff argues persuasively that because the Government was responsible for the petition for writ of *certiorari* seeking review of the Fifth Circuit's dismissal for lack of standing, which the Government urged should have been a dismissal for lack of jurisdiction, the Government, not plaintiff, was responsible for the continued pendency of *Gaubert v. United States* when the instant action was filed. (On remand the Fifth Circuit upheld the district court's dismissal of both claims for lack of subject matter jurisdiction. *Gaubert v. United States,* 932 F.2d 376

The proper inquiry required by section 1500 compares the claims raised in the Court of Federal Claims and those raised in the other lawsuit to see if the cases are based upon substantially the same operative facts. *Keene,* —— U.S. at ——, 113 S.Ct. at 2038–40. Plaintiff's loss of the Cedar Lane property and the loss of his equity in IASA are part of a continuum of events which started with the Investex merger in 1984 and ended with IASA's insolvency in 1986. The regulators' alleged wrongdoing is diffuse and intricately woven throughout each of plaintiff's claims. Plaintiff cannot separate the claims as discrete transactions, or distinguish the Cedar Lane claim as a agreement unconnected with plaintiff's other contacts with the regulators. The underlying facts of both claims are common, interlinked, and ultimately unseverable. The $75 million claim and the $25 million claim filed by plaintiff in Texas district court are effectively based upon the same grievance, and the pendency of the latter claim in the Fifth Circuit when he filed suit in the Claims Court divests this court of subject matter jurisdiction, as required by section 1500.

Even if plaintiff's pending claim in the Fifth Circuit did not bar the Court of Federal Claim's jurisdiction over the instant case, the pendency of *Gaubert v. Gray* in the U.S. District Court for the District of Columbia would have similarly foreclosed jurisdiction under section 1500. In *Gray* plaintiff sought recovery under a *Bivens* claim that regulators had unconstitutionally violated his property rights.

Plaintiff contends that *Gray* must be distinguished from the instant case in that

(5th Cir.1991)). It is true 28 U.S.C. § 1500 manifestly was not enacted to spare the Government duplicative suits that it alone is responsible for perpetuating. *Cf. UNR Industries, Inc. v. United States,* 962 F.2d 1013, 1024 (Fed.Cir.1992) (petition for writ of *certiorari* is process, which, if pending when Claims Court action is filed, triggers section 1500), *aff'd sub nom. Keene Corp. v. United States,* —— U.S. ——, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993). However, given that plaintiff's claims involving the Cedar Lane property were pending in federal district court when this lawsuit was filed, *see* p. 600 *infra,* the court need not resolve this question.

the District of Columbia action sought recovery against officials in their individual capacities. Plaintiff argues that because the United States was not a defendant in the district court, jurisdiction is not barred over the case at bar. This is a difficult distinction. The district court held that the regulatory agents acted within their sovereign official roles, rather than their personal capacities, when they dealt with plaintiff. *Gray,* 747 F.Supp. at 47. Plaintiff contends that the district court's characterization of plaintiff's action is not dispositive. Instead, the allegations of the complaint which charge that defendants were acting only in their individual capacities (although the complaint alleges that the defendants were acting "under color of the authority of the Federal Home Loan Board," Compl. filed Dec. 24, 1987, preamble) should govern for purposes of ascertaining the applicability of section 1500.

The court is of the view that the intendment of the statute would be frustrated if the phraseology employed by the pleader were allowed definitively to characterize whom he sued.[7] As the Supreme Court noted in *Keene,* section 1500 was intended to prevent duplicative suits against the Federal Government and its officials by preventing a plaintiff from filing suit in the predecessor to the Court of Federal Claims on an existing claim "against an officer or agent of the United States." *Keene,* —— U.S. at ——, 113 S.Ct. at 2039 (citing Act of June 25, 1868, ch. 71, § 8, 15 Stat. 77). The operative facts of a claim, rather than choice of defendants or theory of recovery, are dispositive. *Id.*[8]

Plaintiff might have fared better had his counterclaim in *Federal Savings and Loan Insurance Corp. v. Crowe* been the only outstanding claim against the Government. In *Crowe* the Government sued plaintiff for recovery of the money paid in an ESOP stock transaction. Plaintiff filed a compulsory counterclaim for recoupment to reduce or defeat any recovery by the FSLIC against him. This counterclaim was pending at the time the instant case was filed. Plaintiff claims that such a compulsory counterclaim is not equivalent to seeking relief on the merits of his present case. There is strength to this argument, as plaintiff's counterclaim reflects no "election" to litigate damages according to any choice of courts. However, the issue is moot as the court cannot exercise jurisdiction due to the other pending claims.

Lastly, plaintiff argues that the court should deny the instant motion to avoid defendant's attempts to "whipsaw" plaintiff's claims by challenging jurisdiction at every turn. The court acknowledges plaintiff's frustration. His able counsel diligently have sought a forum to hear his claims and have been rebuffed on jurisdiction at every turn. Perhaps the Court of Federal Claims was the appropriate court, but by virtue of having filed elsewhere before his present complaint, plaintiff now finds access to justice withheld. This is a disturbing situation. The legitimacy of section 1500 would be indicted were it not for the fact that the Government frequently expends enormous resources defending on jurisdictional grounds, including discovery and trial proceedings. That the instant case did not tax the Government so severely cannot control the court's decision. Although the court may be the exclusive forum to assert plaintiff's claim under the Tucker Act, 28 U.S.C. § 1491(a)(1) (1988), he cannot do so while seeking relief against the Government in other courts.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss is granted. The Clerk of

---

**7.** *Hill v. United States,* 8 Cl.Ct. 382, 388 (1985), is not to the contrary. In emphasizing that section 1500 applies only to suits against a person acting under authority of the United States in his official capacity, the court did not reach the question whether the phraseology of the complaint's allegations is dispositive.

**8.** Following dismissal of plaintiff's federal claims, the district court in *Gray* rejected jurisdiction over plaintiff's common law tort claims for lack of pendent jurisdiction. 747 F.Supp. at 50 n. 7. Defendant makes the point that the allegations sounding in common-law tort are the same as those pleaded in the instant case and involve some $75 million, so that, irrespective of the *Bivens* issue, the pendency of the state claims in *Gray* invokes the bar of section 1500.

Court shall enter judgment dismissing the complaint for lack of jurisdiction. This operates as a dismissal without prejudice.

No costs.